**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

EUGENE N. DIRL,           )
                                       )
          Plaintiff,          )
                                       )     Civil Action No. 13-766
          v.              )
                                       )     Judge Nora Barry Fischer
CAROLYN W. COLVIN,     )
Commissioner of Social Security,  )
                                       )
          Defendant.     )

## MEMORANDUM OPINION

## I.  INTRODUCTION

Eugene N. Dirl ("Plaintiff") brings this action under 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401–433, 1381–1383(f) ("the Act"). (Docket No. 3). This matter comes before the Court on cross motions for summary judgment. (Docket Nos. 9, 13). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment [9] is granted, in part, and denied, in part, and Defendant's Motion for Summary Judgment [13] is denied.

## II.  PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on July 12, 2010, claiming a disability onset of June 15, 2009 for arthritis in his hip,[1] lower back, and knee, as well as a gunshot wound.[2] (R. at 24, 65,

---

[1] In December 2010, Plaintiff told social worker James M. Carroll at the VA at Highland Drive that he had applied for disability "because of his hip." (R. at 382).

97–116).[3] Plaintiff's claims were initially denied on August 30, 2010 due to insufficient evidence provided by Plaintiff.[4] (*Id.*). Plaintiff then requested an administrative hearing. (R. at 24). This hearing was conducted on October 7, 2011 in Pittsburgh, Pennsylvania, in which Plaintiff, represented by Ruth Kolb, and Samuel E. Edelmann, an impartial vocational expert, testified. (R. at 35–62).

On October 26, 2011, the Administrative Law Judge (ALJ) issued his ruling, which was partially favorable to Plaintiff. (R. at 20). The ALJ found that Plaintiff became disabled as of July 26, 2011, and continued to be disabled through the date of the ALJ's decision. (R. at 32). Consequently, the ALJ determined that Plaintiff was eligible for SSI benefits as of the date of disability. (R. at 33). However, the ALJ denied Plaintiff's claims for DIB because Plaintiff did not meet the Act's insured status requirements as of July 26, 2011, given that Plaintiff was insured only through March 31, 2011. (R. at 24–26, 33, 124). On December 27, 2011, Plaintiff appealed the ALJ's decision regarding DIB to the Appeals Council. (R. at 17). On May 10, 2013, the Appeals Council denied Plaintiff's request for review, thereby making the decision of the ALJ the Commissioner's final decision. (R. at 1).

Plaintiff filed his Complaint on June 5, 2013. (Docket No. 3). Defendant filed her Answer on August 27, 2013. (Docket No. 6). The parties then filed cross-Motions for Summary Judgment. (Docket Nos. 9; 13). The matter having been fully briefed, (Docket Nos. 10; 14; 16; 17; 19), is now ripe for disposition.

---

[2] In October 2010, Plaintiff told Nurse Susan Rose at the VA at Highland Drive that his temporary disability paperwork was "due to hernia surgery," which was incident to his gunshot wound. (R. at 388).
[3] Citations to Doc. No. 8-1 through 8-20 are hereinafter referred to as "R. at ____."
[4] The Administrative Law Judge (ALJ) misstates this date as September 1, 2010. (R. at 24).

## III.    STATEMENT OF FACTS

### A.    General Background

Plaintiff was born on April 28, 1955, and was fifty-six[5] years of age at the time of his administrative hearing. (R. at 40). He is a six foot one inch tall and 280-pound adult male. (R. at 48). He attended high school through the eleventh grade, completed his GED in 1973, earned his Commercial Driver's License (CDL), and has also received vocational training in arc welding. (R. at 41, 118, 151). Additionally, Plaintiff served in the military from May 5, 1980 through May 6, 1983 and afterwards sought services from the Department of Veterans Affairs ("the VA"). (R. at 101, 286, 336, 368).

Plaintiff has one brother, who is an alcoholic and suffers from depression. (R. at 354). His parents are deceased, and his father was an alcoholic. (*Id.*). Plaintiff was married from August 8, 1989 until January 1, 2006, when the couple divorced. (R. at 97–98). He has no children. (R. at 368). As of June 2010, Plaintiff had a girlfriend, (R. at 142), although this relationship had ended by March 2011, (R. at 368). Plaintiff occasionally consulted the VA for assistance with homelessness from 2008 through 2010.[6] (R. at 157–58, 160–65, 168–69, 175).

### B.    Work History

Plaintiff reported that his employment history spanned from roughly 1995 until 2010. (R. at 42–44). From 1995–1996, Plaintiff was a paint mixer at Gateway Paint and Chemicals, which included a lot of labor, dock work, and heavy lifting. (R. at 42). From 1998–2001, Plaintiff was a laborer doing different jobs with a lot of lifting. (R. at 41–42). From October 22, 2008 through December 10, 2008, Plaintiff participated in the Department of Veterans Affairs Compensated

---

[5] Plaintiff is defined as a "Person of advanced age." 20 C.F.R. §§ 404.1563(e), 416.963(e).

[6] On March 10, 2009, Plaintiff moved into Housing and Urban Development—Veterans Affairs Supportive Housing (HUD-VASH), reporting that he had been homeless prior to that date. (R. at 290, 320).

Work Therapy vocational rehabilitation program. (R. at 150). Through this program, he worked for hospital environmental services, lifting more than fifty pounds, (R. at 42, 150), but quit because he "could not handle the work" due to arthritis. (R. at 150). He then had different jobs as a truck driver hauling steel over long distances for long periods of time. (R. at 42–43). These truck driving jobs included some lifting. (R. at 43).

The record contains inconsistent information about Plaintiff's work history in 2010. For example, on July 29, 2010, Plaintiff completed a Form SSA-3368 disability report, wherein he stated that he was not currently working, and that he had stopped working on June 15, 2009 because of his physical condition. (R. at 118). However, beginning on February 9, 2010, Plaintiff received vocational counseling at the VA Healthcare System, Heinz Division in Pittsburgh, Pennsylvania (VA Heinz). (R. at 150–62). At this initial appointment, Plaintiff reported that he had been unemployed since a truck-driving job in November 2009 and "has been searching for employment." (R. at 27, 150). Plaintiff further indicated that "he was going to be hired for a Comtran company in McKees Rocks," except that his eye glasses were broken, for which he was referred for a patient assistance program to receive affordable eye glasses. (R. at 150). Plaintiff testified at the hearing that he worked for several months in 2010 through LifeWork. [7] (R. at 44). This job involved piecing things together and entailed sitting down for long periods of time. (R. at 44–45). The record shows that throughout 2010, Plaintiff received community/work reintegration training and vocation motivation group therapy. (R. at 157–58, 160, 162, 203, 385, 388–89).

In November 2010, Plaintiff reported to Vocational Rehabilitation Specialist, Edward C. Seftas, that he had secured employment as a school bus driver. (R. at 259, 385). In December

---

[7] Plaintiff explained that his LifeWork position was an "entitlement" and part of a transitional program to help individuals move from being homeless or in a rehabilitation program "back into the mainstream." (R. at 44).

2010, Plaintiff told SW Carroll that he was fired from driving a Monark bus because he failed a drug test. (R. at 27, 382–83). Plaintiff claimed that he did not work in 2011. (R. at 44).

However, Plaintiff told SW Carroll that he had a job interview with a bus company in February 2011. (R. at 381). Then, in March 2011, Plaintiff reported to Center for Treatment of Addictive Disorders (CTAD) case manager Jane E. McClelland ("McClelland") that he needed to look for a job, (R. at 359), and told SW Carroll that he needed to renew his CDL license so he could start work at a trucking company soon. (R. at 356). By April 2011, Plaintiff had planned with SW Carroll to apply for truck driving jobs, (R. at 337), and he renewed his CDL license. (R. at 340). On April 29, 2011, SW Carroll reported that Plaintiff had completed CDL training at Diamondback Trucking in Ambridge, Pennsylvania in order to drive a truck in and out of steel mills, and that Plaintiff had a job interview on May 2, 2011 at U.S. Steel in Clairton, Pennsylvania. (R. at 338). In May 2011, Plaintiff was attending job training and expected to be "working shortly driving a truck." (R. at 334–35). On June 29, 2011, Plaintiff reported to SW Carroll that he was briefly employed as a dump truck driver but he had quit because the truck owner was charging Plaintiff for truck damages he did not believe were his fault or responsibility. (R. at 27, 317).

After that job, Plaintiff planned to search for new employment, (R. at 311, 318, 331), inquired about financial aid for truck school recertification, (R. at 311), and expressed interest in obtaining hazardous materials certification on his CDL license. (R. at 318). In July 2011, he reported to nurse practitioner Susan Byerly (Byerly) of the VA at Highland Drive that "he can do security," which would be his choice occupation, and he "would like to work." (R. at 293–94). SW Carroll also gave Plaintiff a list of security companies to which he could apply after Plaintiff

indicated that he was "giving up on truck driving for the time being." (R. at 306). Therefore, as of July 2011, Plaintiff was looking for new employment.

Following his heart attack in July 2011,[8] Plaintiff's employment search was put on hold because of his medical issues. On August 1, 2011, Plaintiff was turned down from CTAD[9] by case manager McClelland and Dr. Dunbar because he had to complete his cardiac rehabilitation before entering the program. (R. at 283–84). Plaintiff was also cautioned to avoid overworking himself. (R. at 283). Additionally, his compensated work therapy was put on hold. (R. at 278).

### C.    Medical History

Plaintiff's medical history is discussed in the following five categories: (1) polysubstance abuse of cocaine and alcohol; (2) status post gunshot wound to abdomen and resulting hernia repair; (3) arthritis of the right hip, knee, and low back; (4) heart attack; and (5) additional medical history including obesity, gastro-esophageal reflux disease (GERD), hypertension, gall stones, depression, and sleep disorder.

### 1.    Polysubstance Abuse of Cocaine and Alcohol[10]

Plaintiff has an extensive history of alcohol and crack cocaine abuse. (R. at 177, 287, 336). Plaintiff began using crack cocaine in 1983, following his mother's death. (R. at 182). He has been hospitalized and entered rehabilitation programs for addiction in 2001 (Salvation Army), 2003 (Salvation Army), 2004 (VA Highland Drive), 2006 (Butler Domiciliary Program,

---

[8] *See infra*, Section III.C.4.
[9] CTAD provides a continuum of assessment, consultative and therapy services including outpatient and residential treatment to Veterans with a range of concerns, including substance abuse. *See* VA PITTSBURGH HEALTHCARE SYSTEM: CENTER FOR TREATMENT OF ADDICTIVE DISORDERS (CTAD), http://www.pittsburgh.va.gov/services/ctad.asp (last visited January 27, 2014).
[10] The Court notes that the ALJ found that Plaintiff's substance use disorders were not contributing factors material to the determination of disability pursuant to 20 C.F.R. §§ 404.1535, 416.935. (R. at 33).

incomplete), 2007 (VA Pittsburgh HSC Heinz Division),[11] and 2008. (R. at 152, 182). He also attended group psychotherapy at the VA regarding his drug abuse from 2008 through 2011. (R. at 159–61, 163–69, 170, 172, 174–75, 333, 339, 341–43, 345–50, 352–53, 357–58, 361–62, 366, 379). SW Carroll noted that Plaintiff has completed twelve rehabilitation programs since 1987 and maintained sobriety for eighteen months in 1990 and 1991, but has never dedicated himself to a twelve-step program. (R. at 52, 287, 336).

In 2010, Plaintiff sustained varying periods of sobriety. On May 6, 2010, Plaintiff disclosed at Vocation Motivation Group that he did not qualify for a driving job at that time because of his addiction. (R. at 203). In May and June 2010, Plaintiff had been sober for several months, and several urine drug tests were negative. (R. at 142, 191, 201).

In 2011, Plaintiff had multiple drug relapses. On February 22, 2011, Plaintiff reported to SW Carroll that he had a drug relapse the day prior, possibly triggered by his recent Oxycodone[12] prescription. (R. at 374–75). On March 9, 2011, SW Carroll reported that Plaintiff relapsed again, (R. at 363), as confirmed by staff psychiatrist Suman Ahuja. (R. at 353). Staff psychologist Denardi also noted that for the past four months, Plaintiff had been using cocaine approximately two times per week, costing $30 per use, drinking approximately two six-packs of beer per week, and abusing Percocet.[13] (R. at 367). From April 26, 2011 through June 25, 2011, SW Carroll indicated that Plaintiff abstained from drugs and alcohol. (R. at 319, 323–24, 327–

---

[11] For example, from January 19, 2007 through February 6, 2007, Plaintiff attended a VA drug rehabilitation program at the VA Pittsburgh HSC Heinz Division after relapsing in October 2006 and using approximately $300 worth of crack cocaine a week and drinking eight beers every other day. (R. at 182–83).

[12] Oxycodone (or Percocet) is a narcotic (opiate) analgesics pain medication used to relieve moderate to severe pain by changing how the brain responds to pain. *Drugs & Medications – Oxycodone Oral*, WEBMD, *available at* http://www.webmd.com/drugs/mono-5278-OXYCODONE+-+ORAL.aspx?drugid=1025&drugname=oxycodone+oral (last visited Nov. 22, 2013).

[13] *Id.*

28). But, on April 29, 2011, Plaintiff relapsed again, which he blamed on "being proud and complacent." (R. at 336).

Just prior to his heart attack in July 2011, Plaintiff telephoned SW Carroll to notify him that he had relapsed and had been actively using for "the past few weeks." (R. at 281, 299). On July 25, 2011, Plaintiff was assessed by social worker Amy Boyles at the VA at Highland Drive for a rehabilitation program. (R. at 295). Treatment notes further detail that Plaintiff had not been compliant with his prescribed medication for several months, and had been abusing alcohol and cocaine. (R. at 249, 281, 293). Upon admission to UPMC Presbyterian for his heart attack, Plaintiff reported that he drank a few beers every other day and he had recently used cocaine, although he was unclear how often he was using this substance. (R. at 492, 498). After his heart attack, Plaintiff acknowledged that he was "afraid to use cocaine because of his heart," and he was instructed to remain clean and sober. (R. at 283–84). As of August 25, 2011, SW Carroll assessed that Plaintiff had abstained from drugs and alcohol since his heart attack. (R. at 268, 272).

## 2. Status Post Gunshot Wound to Abdomen and Resulting Hernia Repair

In 1985, Plaintiff suffered a gunshot wound to his abdomen. (R. at 141, 431). This injury was initially repaired via an exploratory laparotomy[14] at Allegheny General Hospital. (R. at 141, 183, 431, 436). In March 2008, he began experiencing pain at the site of this wound and was subsequently found to have a hernia.[15] (R. at 179). On April 23, 2008, Plaintiff's gunshot wound

---

[14] An exploratory laparotomy is a surgery that opens the abdomen. *Abdominal Exploration*, MEDLINEPLUS, *available at http://www.nlm.nih.gov/medlineplus/ency/article/002928.htm (last visited Nov. 22, 2013).*

[15] A hernia is a "[p]rotrusion of a part of structure through the tissues normally containing it." STEDMAN'S MEDICAL DICTIONARY 879 (28th ed. 2006).

was further repaired by an open ventral hernia repair[16] that was complicated by enterotomy[17] requiring laparotomy and hernia repair with AlloDerm mesh.[18] (R. at 142, 179–80, 201, 431, 436).

In October 2008, Plaintiff went to the emergency room with pain at the hernia repair site and a computed tomography (CT) scan revealed a recurrence with an incarcerated piece of fat. (R. at 201, 218–20). Plaintiff did not follow up with his doctor as instructed. (R. at 201). On March 25, 2009, Plaintiff presented to the VA Emergency Department complaining of abdominal pain. (R. at 169). Then, on April 26, 2010, Plaintiff went to the VA Pittsburgh HCS Heinz Division as a walk-in patient and reported to nurse practitioner Byerly that he was experiencing discomfort at the site of his 2008 hernia repair, especially after he ate and "gorged" himself. (R. at 144, 204). He also stated at this time that he had gained weight. (R. at 204). Eventually, Plaintiff scheduled another hernia surgery for July 2010, in order to coincide with his work program's schedule. (R. at 201).

On August 27, 2010, Plaintiff was admitted to VA Highland Drive for an open incisional hernia repair, which was performed by Drs. Amber N. Wooten and Brian S. Zuckerbraun with Ventralex mesh.[19] (R. at 244–45, 396, 406, 420, 429, 436). There were no complications during the procedure. (R. at 403, 406, 436–37). After surgery, Plaintiff experienced some incisional pain

---

[16] An open ventral hernia repair fixes a weakness in the muscle and tissue of the abdomen by using a skin incision over the area of the hernia. *Reference Summary*, X-PLAIN INCISIONAL, VENTRAL HERNIA REPAIR, *http://www.nlm.nih.gov/medlineplus/tutorials/incisionalhernia/gs049304.pdf* (last visited January 27, 2014).

[17] An enterotomy is an incision into the intestines. *Enterotomy*, MERRIAM-WEBSTER, *available at http://www.merriam-webster.com/medical/enterotomy* (last visited January 27, 2014).

[18] AlloDerm mesh is made of decellularized human cadaveric dermis and is used in tissue reconstruction and hernia repairs. *Results of AlloDerm use in Abdominal Hernia Repair*, PUBMED, *available at http://www.ncbi.nlm.nih.gov/pubmed/18209948* (last visited January 27, 2014).

[19] Ventralex mesh is a composit PTFE/polypropylene patch that allows intraperitoneal placement behind the hernia through a small incision. *Ventralex mesh in umbilical/epigastric hernia repairs: clinical outcomes and complications*, PUBMED, *available at http://www.ncbi.nlm.nih.gov/pubmed/18309451* (last visited January 27, 2014).

but refused narcotics because of his history of substance abuse. (R. at 420–21, 425). He was discharged on August 30, 2010 and instructed to do no heavy lifting greater than fifteen pounds, avoid strenuous activity, and walk as tolerated. (R. at 244–45, 399). His discharge medications included a multivitamin and Oxycodone. (R. at 400–01).

On September 8, 2010, Plaintiff presented to nurse Linda J. McDonald at VA Highland Drive, complaining of acute right side pain. (R. at 393). Five days later, Dr. Wooten at VA Highland Drive examined Plaintiff for a post-operative evaluation and staple removal. (R. at 390–91). At this time, Plaintiff voiced no complaints of abdominal pain, and Dr. Wooten opined that his would was healing properly. (*Id.*). On February 13, 2011, Dr. John M. Stramat reported in Plaintiff's Primary Care note that he was doing well with respect to his 2010 incisional hernia repair. (R. at 377).

3.    Arthritis of the Right Hip, Knee, and Low Back

Plaintiff's medical records indicate a history of arthralgia[20] of the knee and low back pain as of 2007. (R. at 153, 156). On October 1, 2008, Plaintiff's abdomen and pelvic CT showed degenerative changes in his spine and both hips. (R. at 219). Subsequently, Plaintiff was diagnosed with degenerative joint disease[21] of the hip and knee. (R. at 142, 190–91). He treated these symptoms by taking over the counter Tylenol Arthritis[22] medicine. (R. at 142, 191). An x-ray of Plaintiff's right hip in October 2010 also showed severe degenerative changes. (R. at 231).

---

[20] Arthralgia means joint pain. *Arthralgia – What is Arthralgia?*, NEWS MEDICAL, *http://www.news-medical.net/health/Arthralgia-What-is-Arthralgia.aspx* (last visited January 27, 2014).

[21] Degenerative joint disease, or osteoarthritis, is the wear and tear on a joint that causes pain and stiffness in joints. *Osteoarthritis*, MEDLINEPLUS, *www.nlm.nih.gov/medlineplus/ency/article/000423.htm* (last visited January 24, 2014).

[22] Tylenol Arthritis is used to treat mild to moderate pain from osteoarthritis and to reduce fever. *Drugs & Medications – Tylenol Arthritis Oral*, WEBMD, *http://www.webmd.com/drugs/drug-76450-Tylenol+Arthritis+Oral.aspx?drugid=76450&drugname=Tylenol+Arthritis+Oral* (last visited January 24, 2014).

Prior to his heart attack in July 2011, nurse practitioner Byerly noted a concern about Plaintiff's ability to walk due to severe osteoarthritis of Plaintiff's right hip and his limited range of motion and rotation. (R. at 293). Plaintiff reported that his hip pain worsened with weather and temperature changes. (R. at 493). On August 17, 2011, Dr. Susan Delanko at the VA at Highland Drive issued Plaintiff a standard metal cane because of his osteoarthritis. (R. at 247–48, 252, 272).

4.    Heart Attack

In May 2010, Dr. Gina M.S. Howell, M.D. noted Plaintiff's shortness of breath with activity and ordered a cardiology evaluation and possible stress test. (R. at 201). On June 22, 2010, Plaintiff had a pre-operative consult for his hernia surgery in which his overall assessment noted "no known CAD, no symptoms suggestive of CAD" and "a normal EKG and good functional capacity" with his highest level of activity that he could climb a flight of stairs or walk up a hill. (R. at 141, 189–90). He was also noted as having no exertional chest pain or shortness of breath. (R. at 142). Plaintiff reported that he had a brisk walk uphill that day to catch the shuttle. (*Id.*).

On July 26, 2011, Plaintiff took an ambulance to the emergency room at UPMC Presbyterian, complaining of chest pain. (R. at 489, 495, 589–93, 594). It was subsequently determined that he had suffered a heart attack. (*Id.*). At the hospital, Plaintiff received a bare metal stent[23] on his left anterior descending artery. (R. at 246, 273–74, 283, 552). Dr. John M. Stramat prescribed Clopidogrel.[24] (R. at 246–47, 272). Plaintiff was discharged on July 29, 2011,

---

[23] A stent is a "small mesh tube that's used to treat narrow or weak arteries. Arteries are blood vessels that carry blood away from your heart to other parts of your body." NAT'L HEART, LUNG, AND BLOOD INST., http://www.nhlbi.nih.gov/health/health-topics/topics/stents/ (last visited January 31, 2014).

[24] Clopidogrel is used to prevent heart attacks in persons who recently experienced a heart attack by blocking platelet blood cells to prevent them from forming blood clots. *Drugs & Medications –*

(R. at 273, 502), with the following medications: Aspirin,[25] Plavix,[26] Labetalol,[27] Lisinopril,[28] Pravachol,[29] and Nitroglycerin.[30] (R. at 283, 581).

Plaintiff was instructed at discharge not to lift anything heavier than five pounds for the next three days, with no restrictions on walking or using steps. (R. at 580, 649, 653). His brother helped him home and then lived at Plaintiff's house with him. (R. at 545, 554). After his discharge, Renee J. Rischer conducted a Cardiopulmonary Rehab Initial Evaluation of Plaintiff at his home. (R. at 545). Plaintiff reported that prior to his admission to the cardiopulmonary rehabilitation unit, he was independently eating, grooming, bathing, dressing, toileting, transferring, cooking, cleaning, doing laundry, grocery shopping, managing money, walking, taking medication, and taking the bus. (*Id.*). He also noted "disability" for his life role/occupation and work skills. (*Id.*).

---

*Clopidogrel Oral*, WEBMD *http://www.webmd.com/drugs/drug-5190-clopidogrel+oral.aspx* (last visited January 27, 2014).

[25] Aspirin has many uses, including reducing the risk of stroke and heart attack by preventing blood clots. *Drugs & Medications – Aspirin Oral*, WEBMD, *http://www.webmd.com/drugs/mono-3-ASPIRIN+-+ORAL.aspx?drugid=1082&drugname=aspirin+oral* (last visited January 27, 2014).

[26] Plavix may be used to prevent a heart attack by preventing a blood clot. *Drugs & Medications – Plavix Oral*, WEBMD, *http://www.webmd.com/drugs/drug-5869-Plavix+Oral.aspx?drugid=5869&drugname=Plavix+Oral&source=0&pagenumber=4* (last visited January 27, 2014).

[27] Labetalol is an alpha and beta blocker used to treat high blood pressure by blocking epinephrine on the heart and blood vessels to lower heart rate, blood pressure, and strain on the heart. *Drugs & Medications – Labetalol Oral*, WEBMD, *http://www.webmd.com/drugs/drug-7212-labetalol+oral.aspx* (last visited January 27, 2014).

[28] Lisinopril is used to treat high blood pressure (hypertension) and is an angiotensin converting enzyme (ACE) inhibitor that relaxes and widens blood vessels to improve blood flow. *Drugs & Medications – Lisinopril Oral*, WEBMD, *http://www.webmd.com/drugs/drug-6873-Lisinopril+Oral.aspx* (last visited January 27, 2014).

[29] Pravachol is used to help lower bad cholesterol while increasing good cholesterol by reducing the amount of cholesterol produced by the liver, which helps prevent heart attacks. *Drugs & Medications – Pravachol Oral*, WEBMD, *http://www.webmd.com/drugs/drug-6988-Pravachol+Oral.aspx* (last visited January 27, 2014).

[30] Nitroglycerin is a nitrate drug that is used to prevent chest pain for people with certain heart conditions by relaxing and widening blood vessels to improve blood flow. *Drugs & Medications – Nitroglycerin Oral*, WEBMD, *http://www.webmd.com/drugs/drug-18030-nitroglycerin+oral.aspx* (last visited January 27, 2014).

5.  <u>Additional Medical History</u>

Plaintiff's medical records indicate consistent problems with obesity, Gastroesophageal Reflux Disease (GERD),[31] hypertension,[32] gall stones,[33] and depression.[34] (R. at 142, 153, 155, 431). He has also claimed medical limitations due to obesity and hypertension, but has sought varying treatment for these medical issues. (R. at 249). For example, on February 13, 2011, Dr. John M. Stramat referred Plaintiff to the VA's MOVE Program to try to lose weight. (R. at 376) At this time, Plaintiff weighed 309 pounds with a body mass index of 42. (*Id.*). Clinical specialist Melanie Erskine of the VA at Highland Drive noted she was unable to reach Plaintiff by phone to discuss weight management. (R. at 255, 376). The record does not indicate whether Plaintiff has engaged treatment for obesity.

Additionally, on March 9, 2011, Plaintiff reported to staff psychologist Denardi that he had a history of untreated depression, which typically worsened during periods of unemployment and caused him to sleep excessively and become tearful. (R. at 360, 367). However, he was never hospitalized or treated for his depression. (R. at 368). As of August 25, 2011, Plaintiff was prescribed Clopidogrel, aspirin, Lisinopril, Nitroglycerin, and Omeprazole. (R. at 266).

In June 2010, Plaintiff's girlfriend noted that he snored heavily when very fatigued and sometimes stopped breathing while asleep, (R. at 142), possibly from sleep apnea. (R. at 137–

---

[31] Gastroesophageal reflux disease is a chronic digestive disorder that occurs when stomach acid or bile flows back into your food pipe, irritating the lining of your esophagus and causing heartburn. *See GERD*, MAYOCLINIC, *http://www.mayoclinic.org/diseases-conditions/gerd/basics/definition/CON-20025201* (last visited February 13, 2014.

[32] Hypertension, or high blood pressure, is a common condition in which the force of blood against a person's artery walls is high enough that this pressure may cause problems such as heart disease. *See High Blood Pressure (Hypertension),* MAYOCLINIC, *http://www.mayoclinic.org/diseases-conditions/high-blood-pressure/basics/definition/CON-20019580* (last visited February 13, 2014).

[33] Gallstones are hardened deposits of digestive fluid that can form in your gallbladder, and then are released into your small intestine. *See Gallstones*, MAYOCLINIC, *http://www.mayoclinic.org/diseases-conditions/gallstones/basics/definition/CON-20020461* (last visited February 13, 2014).

[34] Depression is a mood disorder that causes persistent feelings of sadness or loss of interest. *See Depression (Major Depressive Disorder)*, MAYOCLINIC, *http://www.mayoclinic.org/diseases-conditions/depression/basics/definition/CON-20032977* (last visited February 13, 2014).

39). Plaintiff was referred to a sleep clinic on August 11, 2010, but cancelled the appointment. (*Id.*). On February 13, 2011, Dr. John M. Stramat at the VA at Highland Drive recommended that Plaintiff undergo a sleep consultation because he was overweight with a Body Mass Index (BMI) of 42, snored a lot, and consistently felt tired during the day. (R. at 253). Plaintiff's consultation appointment scheduled for March 16, 2011 was also cancelled because he was a "no-show." (*Id.*). Plaintiff indicated to SW Carroll that he would reschedule the appointment, (R. at 361), but his medical records do not indicate as such.

### D.  Administrative Hearing

An administrative hearing regarding Plaintiff's application for DIB and SSI was held on October 7, 2011 in Pittsburgh, Pennsylvania before ALJ James Bukes. (R. at 24, 36–62). Plaintiff appeared and testified with his attorney, Ruth Kolb, Esquire (Kolb) present.[35] (*Id.*). Samuel E. Edelmann,[36] an impartial vocational expert ("the VE"), also testified. (*Id.*).

Plaintiff testified that day to day, he spent a lot of his time at home due to fatigue, which caused him to sleep during the day and stay awake at night. (R. at 47, 49). He would make his own food, sit on his porch, and do some shopping. (R. at 47). Additionally, he tried to attend appointments early in the morning between 7:00 a.m. and 10:00 a.m. (R. at 50). Regarding employment, Plaintiff testified that his previous work history included jobs with a lot of lifting,

---

[35] Ms. Kolb is mistakenly referred to as "Ms. Cole" in the hearing transcript. Ms. Kolb received her Bachelor of Science degree at Purdue University in 1981, her law degree at the Duquesne University School of Law in 1984, and her Master of Project Management degree at Carnegie Mellon University in 2000. *See Ruth Kolb Biography*, ABOUT THE RUTH KOLB LAW OFFICE, *available at* http://www.ruthkolb.com/about/ (last visited January 31, 2014). She has been practicing social security disability law since 2003 and was previously affiliated with Osterhout Disability Law, LLC and the University of Pittsburgh Office of Child Development. (*Id.*).

[36] Mr. Edelmann received his Bachelor of Arts degree from Ohio University in 1971 and his Master of Education, Rehabilitation Counseling degree from the University of Pittsburgh in 1973. (R. at 87). He has had a private practice of vocational rehabilitation counseling and consulting since 1975. (*Id.*). His previous work experience includes Clinical Senior Lecturer, Clinical Specialist, and Drug Abuse Specialist. (R. at 88). He is certified by the Pennsylvania Department of Labor and Industry and the American Board of Vocational Experts. (*Id.*).

(R. 41–45), but that he was currently unemployed and welfare was his current source of income. (R. at 45). At the time of his hearing, Plaintiff was still fighting his drug and alcohol addictions and had been sober for approximately a week and a half, (R. at 46–47), but was using cocaine and alcohol around once a week. (R. at 51–52).

With respect to his disability, Plaintiff explained that he was unable to work before or after his heart attack, because he could not stand or walk for more than five to ten minutes without pain, limping, or fatigue. (R. at 48). Plaintiff summarized his current physical ailments as follows: In July 2011, Plaintiff had a heart attack. (R. at 45–46). He had begun using a cane three months prior to the hearing. (*Id.*). Plaintiff complained of pain in his right hip, right knee, and lower back, which became more severe during inclement weather. (R. at 46, 49–50). Additionally, Plaintiff experienced pain in his abdomen at the site of his gun shot wound when he sat for a long period. (R. at 58–59). After sitting for twenty to thirty minutes, Plaintiff would have to rub or stretch the area. (R. at 59). Thus, Plaintiff averred that he could not work as a truck driver because he could not sit in the truck for long periods without having to stop and pull over to stretch. (*Id.*). His current medications included Lisinopril, aspirin, Plavix, and Labetalol. Plaintiff stopped taking prescription pain medicine as part of his addiction recovery. (R. at 45).

Following Plaintiff's testimony, the ALJ asked the VE to describe Plaintiff's work history. (R. at 53). The VE testified that: (1) Plaintiff's previous jobs as a laborer were medium to heavy and unskilled, with frequent standing and walking; (2) his jobs as a refuse man and driver were heavy and semi-skilled, with some standing and walking; and (3) his job as a steel hauler was heavy and semi-skilled, with occasional standing and walking. (R. at 53, 56–57). The VE further opined that Plaintiff's driving skills were transferrable to over twenty medium jobs listed in the Dictionary of Occupational Titles (i.e. delivery driver or bus driver) and two light

jobs (i.e. chauffeur or car driver for automobile manufacturers), but were not transferrable to sedentary work. (R. at 53–55, 57). Nationally, about 9,000 of these light jobs existed, while there were hundreds of thousands medium jobs available that required driving skills. (R. at 55). The VE distinguished Plaintiff's prior driving work as heavy because he was lifting over fifty pounds in addition to driving. (R. at 55–56). Medium driving jobs required less than ten percent standing and walking. (R. at 57). The VE confirmed that the medium driving jobs required a CDL and that a person who had a heart attack would have a problem getting a CDL.[37] (*Id.*). Finally, the VE testified that the medium driving jobs mandated stoppage after a certain number of hours, roughly every two to three hours. (R. at 60). He defined "medium work" as carrying up to fifty pounds, frequently carrying up to twenty-five pounds, and generally standing or walking. (*Id.*). The VE defined "light work" as lifting up to twenty pounds, frequently lifting up to ten pounds, and standing or walking the majority of the day. (R. at 61).

IV.    **STANDARD OF REVIEW**

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a

---

[37] Plaintiff testified that he had his CDL at the time of the hearing, pending payment of a fine on it. (R. at 57).

combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[38], 1383(c)(3)[39]; *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the

---

[38] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business.

42 U.S.C. § 405(g).

[39] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

court will review the record as a whole. *See* 5 U.S.C. § 706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Hagans,* 694 F.3d at 292.

Substantial evidence is "more than a mere scintilla but may be less than a preponderance." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545 (3d Cir. 2003). It means "such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Davis v. Astrue*, 830 F. Supp.2d 31, 34 (W.D. Pa. 2011). When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Mussi v. Astrue*, 744 F. Supp. 2d 390, 404–05 (W.D. Pa. 2010) (quoting *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998)); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196–97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Albert Einstein Med. Ctr. v. Sebelius*, 566 F.3d 368, 373 (3d Cir. 2009) (quoting *Monsour Med. Ctr. v. Heckler*, 806 F. 2d 1185, 1190–91 (3d. Cir. 1986)).

## V.  DISCUSSION

In his October 26, 2011 decision, the ALJ found that Plaintiff's earning records showed that he had acquired sufficient quarters of coverage to remain insured for DIB through March 31, 2011. (R. at 24). The ALJ additionally concluded that although Plaintiff was presently under a disability, the onset day of disability was July 26, 2011, and Plaintiff had not been under a disability within the meaning of the Act prior to that date. (R. at 33).

The ALJ determined that Plaintiff satisfied Step One because he had not engaged in substantial gainful activity since the alleged onset date. (20 C.F.R. §§ 404.1520(c), 416.920(c)). (R. at 26–27). While observing that Plaintiff had been employed subsequent to the alleged onset date, he found that the record did not contain sufficient evidence to find that Plaintiff's work activity since June 15, 2009 resulted in "substantial gainful activity" as defined in regulations. (R. at 27). The ALJ went on to note that Plaintiff's work activity from 2009–2011 "certainly indicates that [he] retained at least some amount of work capacity during the relevant time period." (*Id.*).

At Step Two, the ALJ determined that Plaintiff had severe impairments including: coronary artery disease; polysubstance abuse; status post gunshot wound to abdomen in 1985; arthritis of the right hip, knee, and low back; status post hernia repair; and obesity. (*Id.*). (20 C.F.R. §§ 404.1520(c), 416.920(c)). These impairments did not meet one of the listings under the Act, either individually or in combination, and so the analysis proceeded beyond Step Three. (R. at 27). For the remaining steps, and after considering evidence from the Record, the ALJ found that prior to July 26, 2011, Plaintiff had the RFC to perform medium work, except that Plaintiff was limited to standing and/or walking for only fifteen percent of the work day. (R. at 28). Additionally, the ALJ determined that during this time period, Plaintiff was capable of

performing past relevant work, including jobs to which Plaintiff had transferable skills from his prior work as a truck driver. (R. at 31).[40] The ALJ further found that since July 26, 2011, Plaintiff has had the RFC to perform a full range of sedentary work, and has been unable to perform any past relevant work. (R. at 30, 32). Considering the Plaintiff's age, education, work experience, the RFC, and the VE's testimony, the ALJ concluded there are not a significant number of jobs existing in the national economy wherein Plaintiff is able to work since July 26, 2011, given his limitations. (*Id.*). The ALJ concluded that Plaintiff was not under a disability within the meaning of the Act at any time through March 31, 2011, the date he was last insured for DIB purposes. (*Id.*).

Plaintiff argues that the ALJ erred at Step Five when he incorrectly found that, prior to July 26, 2011, Plaintiff had transferrable skills from past relevant work that were within his RFC. (Docket No. 10 at 5–11; Docket No. 16; Docket No. 19). Defendant argues that the ALJ's determination—also characterized as being a Step Five decision—was supported by substantial evidence because the VE identified work that Plaintiff could perform despite his limitations. (Docket No. 14 at 7–8; Docket No. 17).

In this Court's estimation, however, the ALJ's decision is ambiguous with respect to whether he determined that Plaintiff was not disabled prior to July 26, 2011 at Step Four or Step Five. For example, the ALJ determined that:

> 7. Prior to July 26, 2011, the claimant was capable of performing jobs to which he has transferable skills from past relevant work as a truck driver. This work did not require the performance of work related activities precluded by the claimant's residual functional capacity.

(R. at 31). The ALJ then found that:

---

[40] *See* discussion, *infra*, at 20–22 regarding this finding.

8. Beginning on July 26, 2011, the claimant's residual functional capacity has prevented the claimant from being able to perform past relevant work.

(R. at 32). Paragraph 8's conclusion that Plaintiff was not able to perform past relevant work beginning on July 26, 2011 implies that prior to that date, Plaintiff was able to perform such work. Under this interpretation, the ALJ would have decided at Step Four that Plaintiff was not disabled prior to July 26, 2011. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (2012) ("At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled."). However, Paragraph 7 does not explicitly state that prior to July 26, 2011, Plaintiff was capable of performing past relevant work. (R. at 31). Rather, the Paragraph discusses the transferability of skills, (R. at 31), which does not become relevant until Step Five. SSR 82-41 (1982).

Moreover, a review of the hearing transcript does not clarify the ALJ's analysis. To this end, the Court notes the following exchange between the ALJ and the VE:

> Q      So if this person was capable of medium – he performed the jobs as generally performed in the economy, is that right?
>
> A      Those specific jobs, yes, he did, but they were heavy because he ha[d]the tarp and chain loads that exceeds 50 pounds.
>
> Q      Right.
>
> A      If he didn't have that to do, if he was just driving the truck, it would be medium.
>
> Q      But he did it joint –
>
> A      Yes.
>
> Q      So if this person was capable of medium work, would he [be] able to do any of these jobs?
>
> A      He would be able to do a number of truck driving jobs. The only thing that brought it to the heavy level was he was hauling

steel, as opposed to over-the-road truck driver where you don't generally have to unload and offload and that's considered medium.

Q    So what is the road?

A    It's considered medium, sir.

Q    If he would do medium work, he could do the over-the-road jobs to which he had transferable skills?

A    That's correct.

(R. at 55–56). The ALJ's questions to the VE suggest that he may have been asking for other jobs to which Plaintiff's skills could be transferred. (*Id.*). It is not clear from the record, however, whether the VE testified that Plaintiff's prior job (i.e., "past relevant work") was typically performed at the medium level of exertion, or whether he was saying that "other work" (similar, but different enough to not be considered "past relevant work") was typically performed at the medium level. (*Id.*). In the latter scenario, the ALJ may have improperly relied on "Step Five" testimony to make a "Step Four" finding.

The parties' arguments go to whether the ALJ erred at Step Five. (Docket Nos. 10; 14; 16; 17; 19). However, in this Court's estimation, the decision as to Plaintiff's claim for benefits prior to July 26, 2011 may have been made at Step Four. If the decision was made at Step Four, then transferability of skills is irrelevant. SS-R 96-8P (1996). Therefore, the Court finds that the ALJ's opinion is too ambiguous to allow meaningful review, in that the decision is susceptible to multiple interpretations, and remand is warranted to clarify the analysis. *See, e.g.*, *Eleleth v. Astrue*, 134 Soc. Sec. Rep. Serv. 310, 2008 WL 3887670, at *5 (W.D. Pa. Aug. 21, 2008).

## VI.    CONCLUSION

Based on the foregoing, Plaintiff's Motion for Summary Judgment [9] is GRANTED, IN PART, and DENIED, IN PART, and Defendant's Motion for Summary Judgment [13] is

DENIED. The decision of the ALJ is VACATED, and this matter is REMANDED for further

consideration, consistent with this Memorandum Opinion. Appropriate Orders follow.

*/s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: February 13, 2014
cc/ecf: All counsel of record.